UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FUNDS IN THE AMOUNT OF | ) |
| APPROXIMATELY $1,565,768.89 | ) |
| SEIZED FROM BANK OF AMERICA | ) |
| ACCOUNT IN THE NAME OF SK | ) |
| DIAGNOSTICS INC. ACCOUNT | ) |
| NUMBER XXXXXXX4240; | ) |
| | ) |
| Defendant. | ) |

## VERIFIED COMPLAINT FOR FORFEITURE

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant property, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

### Nature of the Action

1.      This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2.      This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3.      This complaint is verified by the attached Verification of Ellen Diamond, Federal Bureau of Investigation ("FBI") Special Agent ("SA Diamond"), which is fully incorporated herein.

## The Defendant *in rem*

4.      The defendant *in rem* consists of the following property:

> (a) Funds in the amount of approximately $1,565,768.89 seized from Bank of America account in the name of SK Diagnostics Inc. account number xxxxxxxx4240 ("**SK Account 1**").

5.      The defendant property was seized on or about June 21, 2023.

6.      The defendant property is currently in the custody of the United States Marshals Service.

## Jurisdiction and Venue

7.      This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

8.      This Court has *in rem* jurisdiction over the defendant property pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to this action occurred within the Northern District of Illinois.

9.      Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1395(b)(1)(A) because acts giving rise to this action occurred in this district.

2

## Statutory Basis for Forfeiture

10.     The defendant property is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957, or any property traceable to such property. The defendant property is further subject to forfeit pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), as property that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 1347, 1349, or 1957.

## Specific Allegations

### I.     Background

#### A.     SK Diagnostics Inc.

11.     According to information provided by the Illinois Secretary of State, SK Diagnostics Inc. was incorporated on November 23, 2021. In its annual report for 2022, David Pillai ("Pillai") was identified as the registered agent, President, and Director of SK Diagnostics. As of October 20, 2022, according to Illinois Secretary of State records, SK Diagnostic Inc.'s President and registered agent is Syed Hyder Hussain ("Hussain").

12.     According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), SK Diagnostics is a registered provider with Medicare. Hussain is listed as the "Authorized Official," "Contracted Managing Employee", and "5% or Greater Direct/Indirect Owner." As part of PECOS, there is an electronic funds

transfer ("EFT") agreement between Medicare and SK Diagnostics. According to the EFT agreement, Medicare monies for claim reimbursement by SK Diagnostics were to be electronically deposited into **SK Account 1** starting approximately on or about October 20, 2022.

### B. Medicare Program

13. Medicare is a federal health benefit program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

14. Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.

15. Medicare, as well as private health care benefit programs are "health care benefit programs" as defined by Title 18, United States Code, Section 24(b), that is, a "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual…" 18 U.S.C. § 24(b).

16. Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before enrolling in Medicare. Health care providers seeking to

4

become a Medicare provider must submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider.

17.     Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by Medicare's rules and regulations. As a condition of payment Medicare requires providers to certify all information on the claim is true, correct, and complete. Additionally, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or well-being of the patient. Health care suppliers, like SK Diagnostics, are paid by Medicare through the submission of claims. All Medicare providers are required to submit claims electronically. Those claims are processed through Baltimore, Maryland, and therefore they travel in interstate commerce. Medicare reimburses claims electronically, as well, and payments for Medicare Part A services in Illinois are issued from National Government Services, a Medicare Administrative Contractor headquartered in Indianapolis, Indiana. Payments are made into a provider's bank account through an electronic funds transfer. Providers are also required to maintain all documents that substantiate Medicare claims for at least six years.

18.     Until August 17, 2023, SK Diagnostics was actively enrolled with Medicare. Therefore, at all relevant times, SK Diagnostics was bound by the laws, rules, and regulations that govern Medicare.

19.     As of August 17, 2023, Medicare revoked SK Diagnostics' ability to

participate in the Medicare program and placed them on a three-year suspension from the program.

### C.    Over-the-Counter ("OTC") COVID-19 Test Kits

20.    In April 2022, the federal government announced that individuals with Medicare could receive up to eight OTC COVID-19 tests per calendar month from participating pharmacies and health care providers for the duration of the COVID-19 public health emergency ("PHE") at no cost to beneficiaries. The PHE ended on May 11, 2023, at which point Medicare would no longer pay for eight OTC COVID-19 tests per month at no cost to beneficiaries.

21.    To receive reimbursement from Medicare for the OTC COVID-19 tests, providers were directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034. CMS's guidance to providers billing for these OTC COVID-19 tests is to "only give patients the tests when they request them." Additionally, CMS instructed providers to "keep good documentation. We may ask to see documentation showing a patients' request for tests. If you don't provide the documentation, we could recoup payment and may take other administrative actions."

## II.    Facts Establishing Basis for Forfeiture

22.    SK Diagnostics obtained the funds in **SK Account 1** through the Medicare program by billing Medicare fraudulently for reimbursement for (1) OTC COVID-19 tests for patients who never received the OTC COVID-19 tests and (2) for patients who did not agree to or approve the delivery of OTC COVID-19 tests to their

home.

### A.    Analysis of Medicare Claims Data

23.    Beginning on or about April 3, 2023, despite never having done so before, SK Diagnostics billed Medicare almost exclusively for HCPCS Code K1034 at extraordinarily high rates. As indicated above, this is the billing code applicable for reimbursement of delivery of OTC COVID-19 test kits to Medicare beneficiaries.

24.    SK Diagnostics's billings for HCPCS Code K1034 were submitted to Medicare during a very short period of time and were extraordinarily high.

25.    From the date SK Diagnostics was purchased by Hussain, October 20, 2022, until March 30, 2023, SK Diagnostics did not bill Medicare for shipping any OTC COVID-19 test kits under HCPCS Code K1034.

26.    Between approximately March 30, 2023, and June 5, 2023, a period of just over nine weeks, SK Diagnostics sought payments totaling approximately $94,525,200, and was paid approximately $43,305,656.10, by Medicare. During this time, SK Diagnostics billed Medicare for shipping OTC COVID-19 test kit delivery to approximately 465,614 Medicare beneficiaries.

27.    Medicare claims data also demonstrates an extraordinarily unusual rate of back billing.

28.    For example, SK Diagnostics billed Medicare on May 9, 2023, and May 10, 2023, for OTC COVID-19 test kits allegedly shipped to Medicare beneficiaries from approximately November through December 2022 in amounts totaling over $56 million for more than 2,100,000 test kits for 268,133 beneficiaries.

29.     Billing Medicare five to six months after the purported date of service for such a large number of beneficiaries is exceedingly uncommon and indicative of fraud.

**B.     SK Diagnostics Site Visit**

30.     On October 17, 2023, law enforcement agents conducted a site visit at the practice location for SK Diagnostics. The agents observed an empty storefront at the south end of a single-story strip mall. A sign on the building listing contact information for SK Diagnostics was covered by a banner reading "Retail/Office Space Available" and a telephone number. The office space was empty and appeared to be in the process of being refurbished.

31.     On October 19, 2023, the owner of the property advised law enforcement that the location was utilized for on-site Covid-19 testing, and that Pillai was the owner and point of contact for SK Diagnostics. The owner further advised that s/he was out-of-town between approximately June 2023 through August 2023, and received no rent payments during that time from SK Diagnostics. After the owner returned, the owner saw a closed sign on the door of the business. The owner contacted Pillai and told him to remove the business's possessions from the premises, which was completed in October 2023.

**C.     Medicare Beneficiary Complaints**

32.     Since approximately March 2023, shortly after SK Diagnostics began submitting claims to Medicare for HCPCS Code K1034, Medicare beneficiaries have submitted an extraordinary number of complaints to the government relating to SK

Diagnostics.

33.    Between approximately April 7, 2023, and November 18, 2023, Medicare received 25,547 complaints from Medicare beneficiaries regarding SK Diagnostics.

34.    Although investigators have not yet interviewed all of the beneficiaries, the complaints have been preliminarily reviewed and categorized by the government.

35.    10,986 of the complaints have been categorized as "Did Not Receive Services," and 737 of the complaints have been categorized as "Suspect Identity Theft."

36.    Law enforcement agents have begun to interview Medicare beneficiaries who have lodged complaints relating to SK Diagnostics.

37.    For example, between approximately May 31, 2023, and June 6, 2023, law enforcement agents interviewed 3 individuals who reported that SK Diagnostics had billed Medicare using his/her name for shipment of OTC COVID-19 test kits that were purportedly delivered to them. All 3 individuals reported to the interviewing agent that they had never received or requested a COVID-19 test kit from SK Diagnostics.

**D.    Billing for Deceased Beneficiaries**

38.    As of June 2023, SK Diagnostics attempted to bill Medicare for 471 claims for purportedly supplying OTC COVID-19 test kits on a date after the beneficiary's date of death. In other words, the date of service according to the claim submitted by SK Diagnostics, purportedly the date the test kits were sent or delivered, occurred after the reported death of the Medicare beneficiary.

39.     For example, SK Diagnostics submitted a claim under procedure code K1034 with a purported date of service of April 24, 2023, for a test kit allegedly delivered to Medicare beneficiary G.W. According to Medicare data, however, Medicare beneficiary G.W. died on June 6, 2020.

40.     As another example, SK Diagnostics submitted a claim under procedure code K1034 with a purported date of service of April 25, 2023, for a test kit allegedly delivered to Medicare beneficiary J.S. According to Medicare data, however, Medicare beneficiary J.S. died on March 19, 2019.

41.     Medicare providers who repeatedly bill for services purportedly delivered to dead beneficiaries are often using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of the provision of bona fide services to beneficiaries.

**E.     Lack of Identifiable Business Expenses**

42.     Based upon review of bank records for **SK Account 1** and other financial records, there is no indication that SK Diagnostics had business expenses that one would expect for a company that delivered millions of OTC COVID-19 test kits to hundreds of thousands of Medicare beneficiaries between approximately November and December 2022 as described in paragraph 28.

43.     During that time period, there is no evidence of payment for the regular and sizeable expenses that one would expect for a business operating as a large scale provider of COVID-19 test kits to Medicare beneficiaries, such as for payroll (or to a payroll service provider); for COVID-19 test kits; for shipping, postage, or packaging;

or payments to Medicare billers, from **SK Account 1** or from any other financial account that the government has identified associated with SK Diagnostics.

### F.      Tracing the Funds Sought for Forfeiture

44.      According to Bank of America records, **SK Account 1** was opened on or about October 26, 2022, by Hussain.

45.      The funds sought for forfeiture in **SK Account 1** were obtained from Medicare and represent the proceeds of billing Medicare fraudulently for purported delivery of OTC COVID-19 test kits.

46.      **SK Account 1** was frozen by Bank of America on or about May 11, 2023, prior to the bank's receipt of a seizure warrant issued by a magistrate judge in the Northern District of Illinois.

### G.      Interview of Hussain

47.      Hussain was interviewed by law enforcement on June 27, 2023.

48.      Hussain told investigating agents that he bought SK Diagnostics in October 2022. Among other things, in summary, Hussain stated that Pillai and Feroz Jalal were his partners at SK Diagnostics. Hussain confirmed that he was the owner on paper of SK Diagnostics and its bank accounts, but that Pillai and Feroz Jalal were instructing him how to run the business and what financial transactions to conduct.

49.      Subsequent to the interview, on June 27, 2023, Hussain bought a ticket on Etihad Airways to Hyderabad, India, departing the United States from O'Hare International Airport that same day.

## Conclusion

52.    For the reasons stated herein and in the attached affidavit, incorporated by reference herein, the foregoing defendant property was involved in a transaction or attempted transaction in violation of section 1957, or is property traceable to such property, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(A). Furthermore, the foregoing defendant property was derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341, 1343, 1347, 1349, or 1957, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1)      That process issue for an arrest warrant *in rem* for the defendant property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2)      That due notice be given to all parties to appear and show cause why forfeiture of the defendant property to the United States in accordance with the claims herein set forth should not be decreed;

3)      That this Court enter a judgment of forfeiture for the defendant property to the United States; and

4)      That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

By:      */s/ Brian Hayes*
BRIAN HAYES
Assistant United States Attorney
219 South Dearborn., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated:          December 13, 2023

NORTHERN DISTRIT OF ILLINOIS  )
                              )     SS
COUNTY OF COOK              )

## AFFIDAVIT

I, Ellen Diamond, being duly sworn, upon oath, depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2004. My duties and responsibilities as a Special Agent with FBI include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code 1347 (health care fraud) and Title 18, United States Code 1349 (conspiracy to commit health care fraud). I also investigate allegations of fraud, waste, and abuse in connection with federal and state health care programs, including Medicare and Medicaid. I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants and arrests. I am a graduate of the Federal Bureau of Investigation Special Agent Basic Training Program and Asset Forfeiture and Money Laundering Financial Investigation Seminar.

2.     I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation.

3.      I declare under penalty of perjury under the laws of the United States

of America that the foregoing is true and correct.


Dated: __12|13|2023__             _Ellen Diamond_

                                            ELLEN DIAMOND, Special Agent
                                            Federal Bureau of Investigation